598 So.2d 154 (1992)
UNIVERSAL RIVET, INC. and Nationwide Mutual Insurance Company, Appellants,
v.
Andrew CASH, Appellee.
No. 91-1927.
District Court of Appeal of Florida, First District.
April 20, 1992.
Kimberly A. Hill of Conroy, Simberg & Lewis, P.A., Hollywood, for appellants.
James T. Armstrong of Underwood, Gillis & Karcher, P.A., Miami, for appellee.
WEBSTER, Judge.
In this workers' compensation appeal, the employer and carrier challenge decisions of the judge of compensation claims holding that "remedial attention ... for replacement or removal of [a] surgical staple in [claimant's] right shoulder" is not barred by the statute of limitations; and ordering the employer and carrier to pay for an examination of claimant by a physician. We reverse.
On February 24, 1986, claimant sustained a compensable job-related injury to his right shoulder. In March 1986, the employer and carrier authorized Dr. Robert S. *155 Ennis, a board-certified orthopedic surgeon, to perform an arthroscopic evaluation of claimant's shoulder and, if necessary, a procedure called a staple capsulorrhaphy. Dr. Ennis' arthroscopic examination revealed that claimant had a torn glenoid ligament. Therefore, Dr. Ennis performed a staple capsulorrhaphy.
According to Dr. Ennis, the procedure involved placing the torn ligament in its proper position and then inserting what he referred to as an "internal fixation device," known as a "long fixation staple," through the ligament and into the bone of the anterior portion of the shoulder joint. The purpose of the staple was to hold the ligament in its proper position until the normal healing process had occurred. Dr. Ennis said that one could think of the staple as "[e]ssentially ... a metal stitch." He described the staple as "a very small metal device" "about the size of an eraser on a pencil." Normally, the staple remains permanently in place after the ligament has healed. At that point, however, it serves no further purpose.
Claimant's recovery was essentially uneventful. On May 8, 1986, claimant was permitted to return to light-duty work. (The employer and carrier paid claimant disability benefits from February 24 to May 19, 1986.) Dr. Ennis last saw claimant on July 15, 1986.
On August 3, 1988, claimant returned to Dr. Ennis' office, "complaining of ache and discomfort about his right shoulder." Claimant was seen by one of Dr. Ennis' associates, Dr. Dennis. According to Dr. Dennis, claimant reported that he had had some "mild difficulty" since Dr. Ennis had performed the staple capsulorrhaphy, but that the pain had recently become significantly more severe. Dr. Dennis had x-rays taken, from which he concluded that the shoulder appeared normal and that the staple was in its proper place. Medication and physical therapy were recommended.
Claimant was seen by Dr. Ennis or an associate on three additional occasions subsequent to the August 3 visit. On August 16, 1988, Dr. Ennis noted:
[Claimant] relates his shoulder pain back approximately 18 months ago when he apparently had an injury with his motorcycle and states up until that time his shoulder was fine and pain free. Subsequently he began experiencing severe pain in the shoulder which gradually improved but over the last 8 months his shoulder has become increasingly painful until the point where he is unable to move it without considerable discomfort... . I have reviewed the x-rays taken by Dr. Dennis which show that the anterior glenoid staple remains in good position and does not appear to be impinging on the shoulder in any movement. However, because of the local discomfort in the shoulder, it is difficult to tell whether subluxation is present and whether the capsule may have been ripped from the staple capsulorrhaphy at the time of his injury 1 1/2 years ago... . I think that he has rotator cuff tendinitis at this point and an early capsulitis as well. I am not sure that an arthroscopic evaluation of the shoulder would be of benefit at this time....
On September 27, 1988, claimant reported that he "ha[d] returned to his regular activities which he is able to do." Finding that claimant "ha[d] regained the full range of motion in his right arm," Dr. Ennis released claimant, telling claimant to return should any new problem arise.
The employer and carrier refused to pay for claimant's visits to Dr. Ennis and his associates, or to authorize any further treatment, on the ground that the statute of limitations had run. Therefore, on August 24, 1988, claimant filed a claim, seeking temporary total disability benefits from February 24, 1986, to the date of filing, and until the date of maximum medical improvement; wage loss benefits from the date of maximum medical improvement and continuing or, in the alternative, permanent total disability benefits from the date of maximum medical improvement and continuing; payment of outstanding medical bills; authorization of future medical care; and attorney fees, costs, penalties and interest. The employer and carrier responded that claimant was not entitled to any *156 benefits because the 2-year statute of limitations had run; or, "[i]n the alternative, if the shoulder pin is a prosthesis, then the [s]tatute of [l]imitations bars all claims except for medical associated with the pin."
To the extent relevant to this appeal, Section 440.19(1)(a), Florida Statutes (1985), provides that "[t]he right to compensation for disability, rehabilitation, impairment, or wage loss ... shall be barred unless a claim therefor ... is filed... within 2 years after the date of the last payment of compensation or after the date of the last remedial treatment ... furnished by the employer." Section 440.19(1)(b) provides, in relevant part, that "[a]ll rights for remedial attention ... shall be barred unless a claim therefor ... is filed ... within 2 years after the date of the last payment of compensation or ... after the date of the last remedial attention ... furnished by the employer." However, subsection (1)(b) also contains the following exception: "no statute of limitations shall apply to the right for remedial attention relating to the insertion or attachment of a prosthetic device to any part of the body."
On May 31, 1989, the judge of compensation claims entered an order in which she concluded that the staple inserted by Dr. Ennis into claimant's right shoulder in 1986 was a "prosthetic device," within the meaning of that term as used in Section 440.19(1)(b). Therefore, the judge of compensation claims held that "the 2-year [s]tatute of [l]imitations [found in Section 440.19(1)(b)] does not apply to the right for remedial attention relating to the metallic staple inserted in [c]laimant's right shoulder." Jurisdiction was reserved to address all of the remaining issues at a later date. The employer and carrier sought review in this court of the order of the judge of compensation claims. In an unpublished order, this court dismissed the appeal for lack of jurisdiction, "without prejudice to [the employer's and carrier's] right to raise the statute of limitations issue on final appeal."
A further hearing was held before the judge of compensation claims, to address all pending matters, on December 3, 1990. Because claimant's attorney represented that Dr. Ennis had suggested that "additional procedures or examinations might be in order" to determine whether the staple was causing claimant's complaints, the judge of compensation claims orally ordered the employer and carrier to pay the cost of "a one-time exam" by Dr. Ennis. (After the hearing, to induce the employer and carrier to withdraw a pending request for rehearing, the claimant agreed initially to bear the cost of the examination.)
Dr. Ennis examined claimant on March 5, 1991. Dr. Ennis reported that claimant had full range of motion in his right shoulder, although claimant complained "of some mild discomfort." The staple continued to appear stable in x-rays. While removal of the staple was an option should claimant's complaints continue, Dr. Ennis was of the opinion that, "in all probability," claimant's discomfort was attributable to scar tissue, rather than to the staple. Dr. Ennis concluded that claimant could "continue to work at his regular job activities without restriction." On April 1, 1991, claimant filed a claim for reimbursement of the cost of the examination.
On May 23, 1991, the judge of compensation claims entered a second order which once again held that the staple was a "prosthetic device," within the meaning of that term as used in Section 440.19(1)(b); and that, therefore, that Section's 2-year statute of limitations did "not apply to the right for remedial attention relating to the replacement or removal of the metallic staple inserted in [c]laimant's right shoulder." The judge of compensation claims also held that, because the date of the last authorized medical treatment furnished before claimant returned to Dr. Ennis on August 3, 1988, had been July 15, 1986 (and no compensation had been paid since May 19, 1986), all of the claims other than that for "medical benefits ... related to replacement or removal of the surgical staple" were barred by the 2-year statute of limitations. (As the staple had not been replaced or removed, we assume that the judge of compensation claims was referring to potential future claims for such "medical benefits.")
*157 On June 5, 1991, the judge of compensation claims entered a third order, in which she "conclude[d] as a matter of law" that the 2-year statute of limitations did not "bar ... the medical care rendered to [claimant] on March 5, 1991, by Dr. Ennis" (i.e., the examination). Therefore, over objection by the employer and carrier, she ordered the employer and carrier to reimburse claimant for the cost of that examination. The employer and carrier now seek review of the orders of the judge of compensation claims concluding that the statute of limitations "does not apply to the right for remedial attention relating to the replacement or removal of the metallic staple"; and directing them to reimburse claimant for the cost of the examination by Dr. Ennis. (Claimant does not seek review of any of the rulings below which were adverse to him.)
Whether or not the staple inserted by Dr. Ennis into claimant's shoulder is a "prosthetic device" is, we believe, a mixed question of law and fact. First, the meaning of the term, as used in the statute, must be ascertained. Then, the facts, as developed below, must be analyzed to determine whether or not the staple fits within the statutory meaning.
The term "prosthetic device" is not defined in Chapter 440, Florida Statutes (1985). (Nor, for that matter, has it been defined in any of the succeeding versions of that Chapter.) "[I]f a term is not defined in a statute ..., its common ordinary meaning applies." Department of Administration v. Moore, 524 So.2d 704, 707 (Fla. 1st DCA 1988).
"Prosthetic" is merely the adjectival form of the noun "prosthesis." "Prosthesis" is defined variously as "an artificial device to replace a missing part of the body," Webster's Third New International Dictionary 1822 (unabridged); "[a]n artificial replacement for a part of the body," XII The Oxford English Dictionary 672 (2d ed.); "a device, either external or implanted, that substitutes for or supplements a missing or defective part of the body," The Random House Dictionary of the English Language 1553 (2d ed. unabridged). The definitions found in medical dictionaries are consistent: "[a]n artificial part or substitute for a missing natural part of the body, as a limb, denture, eye, etc.," 3 J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine P-345; "[a]n artificial substitute for a missing part, as denture, hand, leg, eye," Blakiston's New Gould Medical Dictionary 972 (2d ed.); "an artificial substitute for a missing body part, such as an arm or leg, eye or tooth, used for functional or cosmetic reasons, or both," Dorland's Illustrated Medical Dictionary 1369 (27th ed.). From these definitions (and in the absence of any suggestion to the contrary from the legislature), we conclude that the term "prosthetic device," as used in Section 440.19(1)(b), Florida Statutes (1985), was intended to refer to an artificial substitute or replacement, whether external or implanted, for a missing or defective natural part of the body. Applying this definition to the facts developed below regarding the staple inserted into claimant's shoulder, we conclude, further, that the staple does not fit within the definition; and, therefore, is not a "prosthetic device" for purposes of Section 440.19(1)(b).
The only evidence as to the purpose of the staple is found in Dr. Ennis' testimony. (There was no other medical evidence presented.) Dr. Ennis testified that the staple was an "internal fixation device," rather than a "prosthesis or prosthetic device." He described it as "[e]ssentially ... a metal stitch." When asked to explain the difference between an "internal fixation device" and a "prosthesis or prosthetic device," Dr. Ennis explained that the latter "is a substitute for a normal body part"; once substituted, "you could not remove it without removing a specific important function." An "internal fixation device," on the other hand, may be either "artificial or naturally occurring." "It only has the limited function of holding something in place while something is healing. After that, it's superfluous... ."
Because the staple is not a "prosthetic device" within the meaning of that term as used in Section 440.19(1)(b), Florida Statutes (1985), the exception to the 2-year *158 statute of limitations, pertaining to "remedial attention relating to the insertion or attachment of a prosthetic device to any part of the body," is inapplicable. Therefore, like the other claims presented below, which the judge found to be barred; so, too, is the claim for remedial attention related to replacement or removal of the staple, including the claim for reimbursement of the cost of the 1991 examination by Dr. Ennis. Moreover, even if the staple did qualify as a "prosthetic device," the claim for reimbursement of the fee charged by Dr. Ennis for his 1991 examination would still be barred by the 2-year statute of limitations. This is true because, in our opinion, it is clear that the visit to Dr. Ennis in 1991 had nothing whatsoever to do with "the insertion or attachment of" such a "device."
Based upon the foregoing analysis, we hold that it was error to conclude that the staple which had been inserted into claimant's shoulder in 1986 was a "prosthetic device," precluding application to the claim for "remedial attention" of the 2-year statute of limitations found in Section 440.19(1)(b), Florida Statutes (1985); and to order the employer and carrier to reimburse claimant for the cost of the March 5, 1991, examination by Dr. Ennis. Accordingly, we reverse. However, because we believe that this issue is one of considerable concern to the workers' compensation community, we certify to the Supreme Court, as one of great public importance, the following question:
WAS THE FIXATION STAPLE INSERTED INTO CLAIMANT'S SHOULDER A "PROSTHETIC DEVICE," AS THAT TERM IS USED IN SECTION 440.19(1)(b), FLORIDA STATUTES (1985)?
REVERSED.
ALLEN, J., concurs.
ERVIN, J., concurs and dissents with written opinion.
ERVIN, Judge, concurring and dissenting.
The issue in this case is whether the judge of compensation claims erred by concluding that the metallic staple inserted in claimant's shoulder constitutes a prosthetic device within the meaning of Section 440.19(1)(b), Florida Statutes (1985), which thereby precluded application of the two-year statute of limitations to his claim for medical benefits. Initially, I agree that appellant correctly states our review standard, namely, that we must determine whether the judge's award of medical treatment is clearly erroneous, meaning unsupported by substantial evidence, contrary to the clear weight of evidence, or induced by an erroneous view of the law. See Black's Law Dictionary 251 (6th ed. 1990).
Upon consideration of the issue and the record on appeal, I am of the same view Justice McDonald expressed in his concurring opinion in Roe v. City Investing/General Development Corp., 587 So.2d 1323, 1325 (Fla. 1991) (McDonald, J., specially concurring), that is, although I am not positive that the internal fixation device[1] described by the treating physician qualifies as a prosthesis, such was a fact question and I cannot say that the judge's determination in this regard was clearly erroneous based on the evidence below.
The ordinary definition of prosthesis is, as stated in the majority's opinion, ante at 157, that it is an artificial device designed to replace a missing part of the body, typically a limb, denture, eye, etc. The judge below, however, accepted a definition somewhat different from those commonly used in defining the term. That definition, found in Taber's Cyclopedic Medical Dictionary 1392 (15th ed.) [hereinafter Taber's], states that prosthesis is a "replacement of a missing part by an artificial substitute or ... a device to augment performance of a natural function." (Emphasis *159 added.) Moreover, one of the treatises the majority relies upon, Dorland's Illustrated Medical Dictionary 1369 (27th ed. 1988), is not necessarily supportive of a contrary view. While stating the common definition that a prosthesis is "an artificial substitute for a missing body part," it continues by listing as one of several examples therefor an ocular prosthesis, with the comment: "[A]ny other aid to vision, e.g., eyeglasses or occluders." (Emphasis added.) Although eyeglasses cannot be considered as an artificial substitute for a missing body part, they are obviously designed to augment or improve one's deficient vision.
I have no difficulty in accepting appellant's argument that the staple inserted in claimant's right shoulder does not fit the commonly accepted portion of Taber's definition of prosthesis, nevertheless neither appellant nor the majority can muster a convincing case that the device does not otherwise "augment performance of a natural function." Indeed, the judge's implicit finding in such regard is fully supported by the record. Dr. Ennis testified that the device was "used to fix an injured part and to hold it in place while the normal processes of healing occur. At that point the fixation device can either be left in place permanently or can be removed." Clearly both the record and the alternative definition found in Taber's support the judge's determination that the metallic staple was a prosthetic device.
Nor do I consider that the legislature reasonably contemplated that, in excepting from the statute of limitations the insertion or attachment of prosthetic devices, as provided in section 440.19(1)(b), the exception would not apply as well to the maintenance or repair of such devices required after the passage of more than two years.[2] Indeed this view coincides precisely with the following statements made by Justice McDonald:
It appears more plausible that the legislature intended to provide compensation in cases in which the prosthetic device had been attached or inserted before the statute had tolled and subsequently, the prosthetic device became in need of maintenance or repair after the two-year limitations period had lapsed. In such cases there is no question as to what caused the need for treatment. The lack of a causation issue provides a logical distinction between prosthetic devices and other medical treatments and appears to be a rational explanation for the exemption.
Roe, 587 So.2d at 1325-1326 (McDonald, J., specially concurring) (emphasis added).
In that the remedial treatment furnished in the present case after the termination of the two-year limitation period was required in order to decide whether the pain in claimant's shoulder was caused by the prosthesis previously inserted, such treatment was, in my judgment, not barred by the statute of limitations. I would therefore affirm the orders on review in their entirety, but concur with the majority in certifying the question to the Florida Supreme Court.
NOTES
[1] As reflected in the majority's opinion, the operating physician, Dr. Ennis, described the metallic staple as an "internal fixation device." "Internal fixation" is defined as "[t]he surgical procedures of fastening together the ends of a fractured bone by means of metal plates, wires, nails, or screws applied directly to the affected bone, under the soft tissues." 2 J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder I-83 (1992).
[2] The device was placed in claimant's right shoulder during his initial remedial treatment, and he did not seek medical attention therefor until after the expiration of the statutory two-year period.